[DO NOT  PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 7, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10206

_____

D.C. Docket No. 05-01998-CV-GET-1


ELEISON COMPOSITES, LLC,

                                             Plaintiff-Appellant,

                         versus

WACHOVIA BANK, N.A.,

                                             Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____


**(March 7, 2008)**

Before CARNES, BARKETT and HILL, Circuit Judges.

PER CURIAM:

This is an appeal by Eleison Composites, LLC, a Michigan limited liability company (Composites or New Company), from the grant of summary judgment by the district court in favor of Wachovia, N.A. (Wachovia or Bank), and the denial of Composites' motion for partial summary judgment, in this diversity case brought by Composites against Wachovia, predicated upon the Georgia tort law of conversion.[1] In addition to the monies that Composites contends were wrongfully converted by Wachovia when it exercised its right of setoff against funds deposited into Eleison, Inc.'s (Eleison or Old Company or Bank Customer) deposit account, Composites also seeks punitive damages, attorneys' fees, and costs of litigation against Bank. We affirm the judgment of the district court.

## I.

A brief factual history is warranted. In the early 1980s, F. Arthur Simmons (Simmons) and others founded Astechnologies, Inc. (Astechnologies), a company that engineered and manufactured parts and components designed for use in automobile interiors. At its zenith, Astechnologies employed over three hundred people, maintaining three plants in two states, Michigan and Georgia. Wachovia

---

[1] For purposes of this appeal, all references will be made to Wachovia, as successor by merger, to SouthTrust Bank, effective January 1, 2005.

2

provided Astechnologies with the financing for this endeavor, through asset-based term loans and a secured, revolving line of credit.

After two decades, Astechnologies began to struggle financially. In early 2002, it was downsized. Two of its three plants were closed. Employees were laid off. As part of this restructuring, Eleison was created to acquire the assets of Astechnologies. Simmons remained as Eleison's president and sole officer.

Eleison continued with and expanded upon the banking and financing relationship begun by its predecessor, Astechnologies, with Wachovia. More loans were made. The balance owed against the revolving line of credit increased, and Eleison's financial obligation to Wachovia swelled to more than $5,000,000. As collateral for Eleison's indebtedness to the Bank, Wachovia held a first priority security lien interest against all of Eleison's assets, including its accounts receivable.

Simmons opened three Eleison corporate bank accounts with Wachovia: a payroll account, a deposit account and a disbursement account. Simmons executed three business signature cards in Eleison's name as bank customer and depositor. Each signature card contained a deposit agreement with Wachovia in which Eleison agreed to abide by and be bound by the Bank's Rules and Regulations (R&R) governing deposit accounts. Simmons would later testify that

3

he read the terms of the agreements in a cursory fashion.[2]  All parties agree that these deposit agreements were never modified or amended, either orally or in writing.  No other documents govern the accounts.

Not long after it was incorporated, by late 2004, Eleison, like Astechnologies, was in severe financial distress.  Its debt far exceeded its collateral.  Many of its accounts receivable were unpaid and uncollected.  About this same time, Humphrey Capital Group (Humphrey), a Michigan investment

---

[2] R&R Paragraph 4, "Authorization to Pay and Debit the Account," authorized Wachovia to pay funds from the accounts "without regard to the ownership or original source of the funds on deposit and without any requirement that [Wachovia] first notify any other depositor or authorized signer."

In R&R paragraph 6, "Overdrafts; Items Drawn Against Insufficient Funds," Eleison agreed that Wachovia "may return unpaid any item drawn against insufficient or unavailable funds, or in [its] discretion, [Wachovia] may (but [is] not obligated to) pay the item or permit withdrawal even though the payment or withdrawal causes an overdraft in the account."  Eleison agreed to allow the bank to setoff future deposits to cover overdrafts, i.e., "[i]f we do pay an overdraft, we [Wachovia] will collect the amount of the overdraft from future deposits to the account."

In R&R paragraph 6(d), "Liability of Depositor," Eleison agreed to "be personally liable for payment to [Wachovia] of all overdrafts on the account[s] and any interest and late charge thereon, regardless of which depositor or authorized signer created the overdraft and whether [Eleison] knew of the overdraft, participated in activity on the account, or benefitted from the overdraft."

Pursuant to paragraph 15 of the R&R, "Set-Off; Security Interest," Eleison granted Wachovia the right of setoff, and a security interest in all funds deposited to the account, at any time as collateral for the payment and performance of all obligations, then existing or thereafter arising.

R&R paragraph 28, "Assignment of the Account," states that even if Eleison's accounts are assigned to another party, they still "will remain subject to [Wachovia's] right of set-off with respect to obligations incurred and defaults occurring both before and after [Wachovia receives] notice of the assignment."

Paragraph 35 of the R&R, "No Waiver; Governing Law; Miscellaneous," states that "[t]hese Rules may not be amended orally, but only . . . in a writing signed by the depositor and [Wachovia's] authorized representative."

4

firm, approached Wachovia with a financial proposition, ostensibly beneficial to both Eleison and Wachovia. Humphrey offered to purchase Eleison's assets at a steep discount, if, in return, Wachovia would release its liens on all of Eleison's assets. Humphrey would decline to assume any of Eleison's liabilities. Although Humphrey's overture would remain on the table, no agreement was reached at that time.

Several months later, in February 2005, Wachovia officially declared Eleison in default. It accelerated Eleison's entire $5,000,000 indebtedness to the Bank, and demanded immediate payment.

In the meantime, Wachovia and Humphrey resumed their negotiations about a possible discounted asset purchase. By March 2005, Bank and Humphrey reached an agreement. In exchange for Humphrey's cash discounted payment of $1,150,000 to the Bank, or approximately $.23 on the dollar, Wachovia would release its liens and assign its security interests in all of Eleison's assets to Composites, a new Michigan limited liability company, the appellant, formed by Humphrey to implement the agreement and to receive transfer of all of Eleison's assets, including machinery, equipment, inventory, patents and accounts receivable.

Closing took place on April 11, 2005. Simmons, named manager and

president of Composites after closing by Humphrey, remained throughout the years as the common thread in all these transactions.[3]

To effectuate a smooth transition, Wachovia agreed to allow Eleison's three corporate bank accounts to remain open for a short period of time until all of Eleison's outstanding checks cleared and all its outstanding deposits were received.[4] This concession on Wachovia's behalf would soon become the crux of this appeal.[5]

For a time, after closing, outstanding transactions were routinely processed through Eleison's accounts. An account receivable owed Eleison by M-Tek, in the amount of $33,840.66, was deposited into Eleison's bank account at Wachovia. Wachovia in turn wired the sum to Composites' bank in Michigan. Similarly, when an account receivable owed Eleison by the Lear Corporation, in the amount of $39,977.00, was deposited into Eleison's Wachovia bank account, Wachovia wired the sum to Composites' Michigan bank.

---

[3] Unknown to Wachovia, a list of outstanding "critical payables" to "critical vendors" (those Eleison, or Old Company, vendors with whom Composites, or New Company, needed for future business) was composed pursuant to Simmons' instructions.

[4] "Critical vendors" on the list were to be paid from monies in Eleison's deposit account. Vendors not on the list were not to be paid at all. It was Simmons' intention not to honor outstanding invoices issued by "non-critical vendors." Wachovia argues this was a scheme orchestrated by Simmons.

[5] It is unclear from the record why these three Eleison bank accounts were formally neither assigned to Composites, nor retitled in Composites' name as Bank Customer.

By the end of April 2005, all the paper checks Eleison had written to "critical vendors" for outstanding accounts payable had cleared. Eleison's Wachovia disbursement account had a zero balance. Only one Eleison account receivable, from EAC Technologies (EAC), in the amount of $170,708.51, had not, as yet, been received.

There is a side-bar to this story. Unknown to Wachovia, Simmons had gone, apparently "hat in hand," to long-term critical vendor Vetrotex, and negotiated a side, oral agreement with Vetrotex regarding two outstanding invoices, totaling $59,207.10, that Eleison owed Vetrotex. It appears from the record that, by oral agreement with Simmons, Vetrotex agreed to forfeit the monies it was owed by Eleison, in return for the opportunity to do business with a more financially sound company, Composites, on better terms, i.e., Composites would pay Vetrotex cash in advance on all future business dealings.

Ironically, Vetrotex was the only Eleison vendor that had been granted automated clearing house (ACH) debit privileges with Eleison's bank accounts at Wachovia. Its invoices were submitted electronically and not manually. For whatever reason, either intentionally, or inadvertently, to the surprise of Simmons, and, without regard for its oral agreement with him, an automated Vetrotex $59,207.10 debit slip was presented to Wachovia for payment. Notwithstanding

7

the zero balance in the Eleison disbursement account at the time the debit slip was presented, Wachovia paid Vetrotex. The result was a $59,207.10 overdraft in Eleison's account.[6]

Almost immediately thereafter, the EAC account receivable hit Eleison's (now negative balance) deposit account with Wachovia. Wachovia set off its $59,207.10 inadvertent overdraft against the $170,708.51 EAC deposit, and forwarded the balance, or $110,501.41, to Composites' bank in Michigan.

Composites made written demand on Wachovia to return the $59,207.10 in monies set off. Wachovia refused.

## II.

Composites filed a complaint against Wachovia in state court for the intentional conversion under Georgia law of $59,207.10, asserting also, claims for punitive damages, expenses of litigation and attorneys' fees. O.C.G.A. §§ 51-12-5.1; 13-6-11. Based upon diversity jurisdiction, Wachovia removed the action to federal district court.

After discovery, Composites moved for partial summary judgment on its conversion claim, and Wachovia moved for summary judgment on all of

---

[6] The record reflects that Simmons asked Vetrotex to refund the money, but it refused, on the basis that it was rightfully owed. Vetrotex continues to do business with Composites.

8

Composites' claims. The district court granted Wachovia's motion for summary judgment, denied Composites' motion for partial summary judgment, and this appeal follows.

## III.

We review the district court's grant of Wachovia's motion for summary judgment *de novo*. *See In re: Optical Technologies, Inc.*, 246 F.3d 1332, 1335 (11th Cir. 2001) ("[B]ecause summary judgment may only be granted where there is no genuine issue of material fact, any purported 'factual findings' [made by the district court] cannot be 'factual findings' as to disputed issues of fact, but rather are conclusions as a matter of law that no genuine issue of material fact exists." (quoting *Rosen v. Bezner*, 996 F.2d 1527, 1530 n.2 (3d Cir.1993))). "Quite simply, our law is, and has been, that a summary judgment ruling is reviewed *de novo*." *In re: Optical Technologies, Inc.*, 246 F.3d at 1335.

## IV.

### A.

Composites' claim against Wachovia under Georgia law is for the intentional tort of conversion of the $59,207.10 withheld from the EAC deposit into Eleison's account. Composites claims on appeal that it established a *prima facie* case of conversion, and, that the district court erred in denying its motion for

partial summary judgment.

It has long been established under Georgia law that, in order to make a *prima facie* case of conversion, the plaintiff must prove the following five elements of the tort: (1) proof of ownership or title in the plaintiff to the disputed property, or the plaintiff's right to immediate possession of the property; (2) actual possession of the property by the defendant; (3) demand by the plaintiff for the return of the property; (4) the defendant's refusal to return the property; and (5) the value of the property. *See Buice v. Campbell*, 108 S.E.2d 339, 341 (Ga. App. 1959) (citations omitted); *Charter Mtg. Co. v. Ahouse*, 300 S.E.2d 328, 330 (Ga. App. 1983) (citing *Farrar Lumber Co. v. Pickering*, 95 S.E. 1001 (Ga. App. 1918)); *City of College Park v. Sheraton Savannah Corp.*, 509 S.E.2d 371, 374 (Ga. App. 1998).

## B.

We need not reach or discuss (2) through (5) of the elements of conversion. We only analyze the first element of the cause of action of conversion under Georgia law, that is, what is the legal nature of the $170,708.51 in EAC funds deposited into Eleison's, or Old Company's, deposit account, after closing, to third- party Composites?  Does Composites have an ownership interest in the EAC deposit or does it have a security interest?

10

Composites claims that because it purchased the assets of Eleison, which include Eleison's EAC account receivable, Composites held a direct ownership interest in monies deposited in satisfaction of the EAC debt to Eleison.[7] It argues that accounts receivable, or the right to be paid on a debt, are personalty under Georgia law. *See* O.C.G.A. § 44-12-20.[8] In addition, Composites claims, for the first time on appeal, that O.C.G.A. § 11-9-109(d)(4) excludes from the scope of the Uniform Commercial Code - Secured Transactions (UCC), O.C.G.A. §§ 11-9-101 *et seq.*, "[a] sale of accounts, chattel paper, payment intangibles, or promissory notes as part of a sale of the business out of which they arose."[9]

Composites argues that, because the EAC account receivable was expressly excluded from the UCC, then, neither O.C.G.A. § 11-9-327, rules governing

---

[7] We studied the record carefully. We discovered a deposition exhibit, dated prior to closing, which makes note of the EAC receivable, and breaks down the invoices that comprise the EAC debt to Eleison. However, we found that the original Asset Purchase Agreement between Eleison and Composites is omitted from the record.

[8] The statute states that "[a] chose in action is personalty to which the owner has a right of possession in the future or a right of immediate possession which is being wrongfully withheld." O.C.G.A. § 44-12-20.

[9] Wachovia argues that we must disregard this "new argument" raised allegedly for the first time on appeal, and not presented to the district court, that the UCC does not apply in this case, because under O.C.G.A. § 11-9-109(d)(4), a sale of accounts, as part of a sale of a business, does "not concern commercial financing."
    We have carefully reviewed the record and conclude that Composites has not waived this argument. Composites is simply adding additional authority in support of an argument it previously made to the district court on the issue of the legal nature of the EAC deposit as it relates to Composites. *See Polo Ralph Lauren v. Tropical Shipping & Const.*, 215 F.3d 1217, 1221-22 (11th Cir. 2000). The statutory authority offered is properly before us for consideration.

11

"priority among conflicting security interests in the same deposit account," nor O.C.G.A. § 11-9-340(a), the "exercise of right of set-off" against a secured party holding a security interest in the deposit account, relied upon by the district court in granting summary judgment for Wachovia, apply because Composites did not have a "conflicting security interest" in the Eleison's account; it had an "ownership interest." O.C.G.A. § 11-9-109-(d)(4). Therefore, through exclusion from the UCC, Composites asserts that its ownership interest in the deposit funds trumps Wachovia's security interest, and no priority of competing security interest analysis is required. *Id.*

Wachovia contends that Composites cannot prove the first element of conversion because Composites did not "own" the funds in Eleison's deposit account. Wachovia argues that, at best, Composites merely had a security interest in those funds, inferior to Wachovia's setoff rights under common law, the UCC, as codified in the Georgia statutes, O.C.G.A. §§ 11-9-101 *et seq*., Georgia case law, and the contractual R&R governing Eleison's deposit account. *See* O.C.G.A. § 11-1-201(37) (where "security interest" is defined under the UCC to include the interest of a buyer in an account receivable).[10] Wachovia claims that the security

---

[10] *See also* O.C.G.A. § 11-9-102(a)(13)(B) (where the term "collateral" is defined to include accounts that have been sold); O.C.G.A. § 11-9-102(a)(63)(A) (which defines "proceeds" to include whatever is acquired upon the sale or disposition of collateral); O.C.G.A. § 11-9-

12

interest granted to it by its customer and depositor, Eleison, is superior to a security interest, or any other interest, that Composites, a non-customer and non-depositor, may have had in the funds deposited by EAC in Eleison's account.[11]

Wachovia argues that Composites is misguided by its newfound reliance upon O.C.G.A. § 11-9-109(d)(4), because, at most, this language suggests that the UCC does not apply to the transaction *between Eleison and Composites*, in which the accounts receivable were sold by Eleison and purchased by Composites. The section does not exclude, however, a priority dispute *between Wachovia and third-party Composites* as to the funds in Eleison's deposit account. *Id*.

"Under Georgia law, when money is deposited in a bank, title to the funds passes to the bank . . . ." *See Trust Co. of Columbus v. United States*, 735 F.2d 447, 449 (11th Cir. 1984). Wachovia asserts that the actual EAC monies in Eleison's deposit account were comprised of "proceeds" of the account receivable, and not the account receivable itself. In other words, Composites' alleged "ownership of the EAC account receivable" does not equate to the outright ownership of the funds on deposit in Eleison's account. The $170,708.51 sum

315(a)(2) (which provides that a security interest continues in collateral notwithstanding the sale thereof, unless the secured party authorized the disposition free of the security interest).

[11] If Composites were Wachovia's customer and depositor on the three bank accounts in question, a different set of issues would be presented.

13

represents the proceeds of the account receivable and not the account receivable itself. We agree.

C.

In the prior section we concluded that Wachovia held a superior security interest over Composites' security interest. In addition, we also conclude that Wachovia possessed the contractual, case law, statutory and common law rights to setoff the EAC funds deposited into Eleison's account from the amount it subsequently forwarded to Composites' bank in Michigan.

First, the R&R gives Wachovia the contractual right to pay all items properly presented against its accounts, even if those payments created an overdraft, and to setoff funds subsequently deposited in the customer's deposit accounts, to cover any such overdrafts. *See* note 2 *supra*; *see also Design Spectrum, Inc. v. First Nat'l Bank of Atlanta*, 355 S.E.2d 733, 734 (Ga. App. 1987); *Citizens & So. Nat'l Bank v. Weyerhaeuser Co.*, 262 S.E.2d 485, 487 (Ga. App. 1979) (where, in Georgia, a bank has the right to setoff a customer's matured debt against the customer's general deposit account).

Second, in addition to the contractual, case law and common law rights of setoff, Wachovia also has a statutory right of setoff. Under the UCC, Wachovia's setoff right is superior to Composites' security interest in the funds in Eleison's

14

deposit account. O.C.G.A. §§ 11-9-109(a)(1); 11-9-109(d)(10)(A); 11-9-340. These three statutory provisions govern the effectiveness of setoff rights in deposit accounts, bring the scenario before us expressly within the authority of the UCC, and provide that Wachovia's setoff right is superior to any security interest of Composites in Eleison's deposited funds.[12]

## V.

Based upon the foregoing, the judgment of the district court is

**AFFIRMED.**

---

[12] Composites' argument, that Wachovia's knowledge of Composites' third-party security interest in the funds is relevant to this appeal, is without merit and not further discussed. *See* O.C.G.A. § 11-9-341(2). Similarly, Composites' claim for punitive damages, attorneys' fees and expenses of litigation is without merit and not further discussed. O.C.G.A. §§ 51-12-5.1; 13-6-11.

15